Thank you, Your Honor. May it please the Court, my name is Douglas Andresen. I represent the Skokomish Indian Tribe. Council has determined to divide our time with myself taking five minutes, and then Ms. Lorraine Hebert for Lower Elwha, four minutes, and then for the Nine Tribes, Rich Burley, four minutes, and we'll seek to reserve two minutes for rebuttal. As you can see from prior arguments, you can't always count on that allocation, but we'll try to accommodate you as best we can. Thank you, Your Honor. Could you tell me what is the substantial injury to the Skokomish Tribe here? Yes, Your Honor. The basic problem is a race fishery imposes a hobson's choice on a tribe. It has to either take as much fish as fast as it can before the treaty share runs out or decline to fish and settle for the leftovers. It denies a fair share of fish by its very process. The race itself is the only thing that determines each tribe's fair share. And the RFD, Request for Determination, the allegations of which must be accepted as true, specifically alleged a substantial decline in Skokomish's historic harvest and addressed the 2001 harvest statistics showing that decline with respect to geoduck and crab. In addition, a race fishery entirely denies a tribe its right to manage its fishery, which is a part of the right reserve and the means by which the right is implemented. Everything you're saying is solid economics, but I don't know the practicalities here. For example, if we had a race to catch, well, we used to have a race to catch halibut, and it didn't work out very well, so they went to individual fishing quotas. On the other hand, if you had a race to swat mosquitoes, no matter how good one person was at swatting mosquitoes, the other person would still have all the mosquitoes he could swat. I don't know in this case whether there's any substantial injury or damage to the Skokomish, and I think to have standing, they need to prove substantial injury or damage by clear and convincing evidence in order to sue for equitable allocation. Yes, Your Honor, and again, we would urge that the race fishery deprives the tribe of its right to a fair share because there is no such thing as a fair share in a race fishery. It's simply a race. Is there a shortage of fish? Yes, and that's shown by the allegations in the RFD, and there's additional evidence of that set forth in our reply brief at pages 2 to 3. But I would urge that on your point, Your Honor, the right to manage the fishery is also denied because a tribe has no predictable share of fish. But, Counsel, isn't there an inference in the record that the Skokomish actually increased their take? I don't believe so, Your Honor. The RFD recites the historical harvest and then describes the reduction in that harvest, as shown by the 2001 statistics, and that reduction showed that slalom harvested most of the crab and geoduck in Hood Canal that year. And if you look at the 2003 statistics that were in the original RFD and also in the Sparkman affidavit, you see that that problem continued in 2000. What is the showing in the record which would suggest that the Skokomish have decreased or have lost or their take has declined, not in general terms but in relative terms to the other tribes? Again, Your Honor, the evidence is the decline from the historic harvest that are recited in the RFD to slalom taking a majority of the crab and geoduck and nearly twice as much shrimp in 2003 as Skokomish. And, in fact, the substantial harvesting capacity of slalom is shown by the Sparkman affidavit at ER 460, where after the shrimp fishery became a race, slalom harvested about seven times as much as Skokomish. Again, on the right to manage, because you can't reserve fish for cultural purposes or for adjust-to-market conditions or to allow the fishers to fish under their own schedules and needs, it deprives that right. And, in addition, it threatens to preempt the right. And here I would urge that the allegations are quite similar to those in Subproceeding 96-1, where the court allocated 27 percent of the black cod to Quill Ute in response to three tribes' motion for a preliminary injunction asserting that they were denied their fair share and their right to manage by the enhanced use of pot gear by Quill Ute. The same allegations are made here for denial of right to manage and denial of fair share. If I may, Your Honor, I'd like to turn briefly to the court's question and then touch on the Hood Canal Agreement. The district court has very skillfully and successfully managed its jurisdiction over intertribal allocation disputes. In 25 years, there's been little more than a handful of those. And the basis for hearing those cases is that each tribe has a right to a fair share. And, furthermore, as the court held in Passenger Fishing Vessel, an individual tribe may enforce that right. That's what Skokomish is seeking to do here, enforce its right to a fair share by making an allocation. I see my time is up, and I will defer to the next counsel. All right. May it please the Court. My name is Lorraine Hebert, and I represent the Lower Elwha Klallam Tribe. If I could turn to the district court's ruling on the Hood Canal Agreement. The district court held that the party's agreement, the Hood Canal Agreement, bars the Skokomish's allocation claim. The Hood Canal Agreement is the basis for the race judicata, right? Yes. The race judicata argument. The race judicata argument, yes. We, of course, submit that the district court erred on that. Yeah, I mean, that was the district court's basis, right? Yes. Well, it's a little confusing. The court appeared to hold that it lacked jurisdiction, not only because this case doesn't involve treaty rights, although, as Mr. Anderson just explained, it quite plainly does, but the court also seemed to conclude that the – that this was not a dispute that the parties had been unable to resolve themselves because of the Hood Canal Agreement. But the Hood Canal Agreement does not bar an allocation to protect each right's fair share to a fishery. The Hood Canal Agreement provides that each tribe may exercise its respective treaty rights without limitation or control by any of the stipulating parties, but an allocation is not a limitation or control on a tribe's treaty right. That is because each tribe has a – each tribe's treaty right is to a fair share of the fishery, but an allocation would merely determine each tribe's fair share. So in that respect, an allocation is merely enforcing each tribe's right. What does 7B of the HCA mean? Well, Your Honor, I think if you look at it in terms of what the – in terms of the claims that were actually resolved by the Hood Canal Agreement, it's important to keep in mind that the Hood Canal Agreement expressly provides that its purpose is to settle three litigation matters, the Skokomish's primary right RFD, Laura Elwa's UNA RFD, and Port Gamble's UNA RFD. And each of those claims involved the tribes' respective rights to fish in the Hood Canal. So in agreeing that the tribes could exercise their respective fishing rights without limitation or control, the tribes were plainly agreeing not to respect one another's rights to fish, but that doesn't mean that the tribes were consenting to – that they in any way were consenting to an interference with their rights. But that's – and that's what the district court effectively held, that the tribes agreed that unless they could resolve just their differences themselves, they would have no legal redress and a tribe would have to suffer the interference with its rights unless it could convince an offending tribe to stop violating those rights. And we submit that that is not a tenable interpretation of the agreement. And in addition, the district court's interpretation results in a waiver of the tribes' legal rights. It is axiomatic that a waiver of a legal right will not be found absent a clear expression of a party's intent to waive that right. The history of this case demonstrates that the tribes have always understood that the district court's continuing jurisdiction could be invoked where the tribes were unable to resolve disputes concerning treaty fishing rights themselves. The Hood Canal Agreement, however, contains no mention of the district court's continuing jurisdiction, much less an explicit statement that the tribes intended to waive their right to bring disputes before the district court. The absence of an explicit statement should compel the conclusion that the tribes never intended to waive their right to bring an allocation claim in circumstances such as those here. But at the very least, we submit, Your Honor, that the absence of a clear statement renders the Hood Canal at least ambiguous. And if that is the case, then this Court should remand to the district court so that the parties have an opportunity to present the court with evidence concerning their intent. Thank you, counsel. Thank you. Mr. Burley. May it please the Court, I'm Richard Burley. I'm here on behalf of nine tribes who don't fish in Hood Canal. They're not directly involved in these particular fisheries. We're here solely regarding the Court's second ruling that it lacks jurisdiction about most management and allocation disputes. Dare we suggest absence of standing, or do we assume that you have standing in this case? Certainly, Your Honor. We're party to the case. We're bound by every ruling in the case, whether a particular local case. You say the case. You mean U.S. v. Washington? Exactly, Your Honor. U.S. v. Washington. Under the Court's continuing jurisdiction and the order which modifies paragraph 25, the Court made it very clear that every party, whether it participates in a particular sub-proceeding or not, is bound by rulings in all sub-proceedings. This is not an uncommon issue that there might be a broad ruling in a local dispute, which affects everyone, and that's why there are so many attorneys and people here in the room today. It does affect everybody, and this is a prime example of that. In this particular case, the jurisdictional ruling came out of the blue. It was raised by no party. It is a radical change in the rules of this case. You say jurisdictional ruling. You mean the HCA issued it? No. We have no ñ we're strangers to the HCA, Your Honor. All right. It's the jurisdictional ruling of the Court that, in general, it lacks jurisdiction over allocation or management disputes. And this is a new rule. It flies in the face of 30-plus years of other rulings in this case. It's already caused tremendous damage as the tribes are now scurrying around trying to figure out what the new rules may be. It's moved a whole group of potential disputes from the category of something that can be resolved through access to the courthouse door into the self-help category, and we're starting already to see some destabilization in some fisheries that have nothing to do with Hood Canal as the tribes are reassessing their leverage because the door to the court may be slammed. We have ñ there's many, many rulings in this case that involve management. There are at least three longstanding equitable allocation cases that have been brought to the court. Some of them last ñ the first one regarding salmon lasted 10 years. There was never a suggestion that allocation would not be something that could be heard by this court or the Federal courts in an appropriate proceeding. We have Federal jurisdiction here over rights reserved by treaties as a matter of Federal law. The Federal courts have interpreted that as reserving ñ So you're holding on to the lawyer case, the Death on the High Seas Act, and shipping this one off to Mexico. Your Honor, I want to assure you that most disputes do not come before the courts at all. The tribes not only settle most of their disputes among themselves, but each year we've seen fewer and fewer. But as a practical matter, when you're dealing with 20-plus tribes ñ So what you're saying is because sovereign immunity did not keep any of the tribes out of United States v. Washington, they have a form and they are going to keep it as long as the United States goes on to settle inter-Indian tribe disputes. And Indian and non-Indian disputes. This court has decided that the court's continuing jurisdiction and its subject matter jurisdiction and its supplemental jurisdiction include claims of tribal members littering and trampling on shrubs while they're gathering shellfish. I mean, we're talking about expectations based on the court's own rulings. Counsel, you're consuming time on a, let's say, collateral issue. Your side is down to a minute, and I think you might want to reserve. This is our central issue, and I will reserve. Thank you, Counsel. Hey, please, the Court. My name is Lauren Rasmussen for the Port Gambles-Clown and Jamestown-Clown Tribes. And I'm going to go back to a question you asked before that I wasn't able to stand up and answer, which is how long will this case go on. And the reason this case is going on so long is because my esteemed counsel and I, there's become a culture in the case that there's a revolving door at the courthouse. We have our own file room, and we're allowed to come in each and every time that we have a dispute. And the more we misbehave, the more we have the right to come in the door. And I assert to you that the tribes in this State have the same responsibility to get along with each other as everyone else does, and that goes to the central issue that you talked about today, which is what is Kokomis tribe's injury. What, pray tell, in what way are they injured under the treaty of point no point? Now, they say that their share is diminishing because, in some categories, seven times the take as the other tribes. Well, that's creative numbering. First I assert to you, the first thing they said was they cited 2001 statistics, and they said two tribes harvested more than one. Well, okay, there was two tribes harvesting, and we harvested more than one. What's your injury? In addition, 2001 statistics were during the time period where the parties had an agreement. So if we harvested more than they did. But how does one measure injury? Well, you can't measure injury. I mean, if you go back to Ed, if you go to Idaho X-ray Evans and you look at the only case of apportionment of fish and resources, and there there's no treaty, so they're a little more open to what kind of relief. You look at a real and substantial injury in addition to this. Well, that's on the merits. I mean, you have to show by clear and convincing evidence that there's substantial injury in order to be entitled to an allocation. Yes. And I do not see in the record any real and substantial injury claimed by Stokomish. They're taking up to 80 to 90 percent of the resources. That's a motion to dismiss issue. They are fishing. That's not a standing issue. Yes, but they have to go to the language. In order to get to an injury in fact, they have to go to the language in the treaty that entitles them to more than they can catch on a catch-as-catch-can basis. Fair share, unquote. The, quote, fair share in the United States in the passenger fishing vessel case from which they like to quote is the fair share. Let's hear from my colleague first. As a matter of law, how can one say that they lack standing when they have asserted that their fair need is being preempted? Yes, but they failed to assert any facts that showed that their fair need was being preempted. They're taking the majority of the resources in Hood Canal. They haven't shown that reduction that they claim. And then is there a fact issue here that needs to be resolved by the district court? Well, if you chose to resolve the issue on the question of standing, you could go back, but remand would be futile because the facts asserted do not support standing. If you go back to the reasons for the court's dismissal, you look at subject matter jurisdiction and res judicata, okay? And subject matter jurisdiction is the power of the court to hear the case, okay? And the power of the court to hear the case is barred by three problems. Skokoma's request an equitable allocation of the fishery, but the Hood Canal agreement bars an allocation without consent. The request for a primary right of the fishery, which was settled in the Hood Canal agreement, said we want the power to allocate or control the other tribes in the fishery. And they settled with us, and they said, and I quote from 7b, the Skokoma tribe will not under any reason or any condition whatsoever exercise or seek to exercise its primary right in the Hood Canal fishery. Now they come to the court and they say, never mind the agreement. Just tell me what my share is. And the problem is, if you go back to the words of the agreement, it was they that requested the power to allocate and they that failed to get our consent. And it says under no condition or any reason whatsoever. And those are pretty strong words. Now, they say it has to be unequivocal. I say it unequivocal. But that's a pretty, pretty one-sided interpretation, isn't it? In other words, are you freezing in perpetuity the HCA in terms of your interpretation of 7b? No. You know, I see how it could be seen that way. But if you look at the interpretation of the Hood Canal agreement, the point was it's set by the process by which parties would fish in Hood Canal. And they agreed to do this by compact or otherwise. And Skokomish attached a compact to their pleadings. And you see that the compact was the way that the tribes shared the resources. And Skokomish also said the compact was similar to the pretreaty method of sharing the resources, meaning the tribes got together and they hashed it out. And it was hard. And it was hard work. But as long as Skokomish feels like they can go around the agreement and talk to you about getting their fair share, they won't come to us. And as long as they can use the court as a weapon against us to reach their allocation demands, they won't come to us. And so if you have an agreement that has an out, which says I only agree to do this with you unless I can get the court to impose what I want on you, that doesn't seem like a fair agreement. All right. Counsel, with respect to this proceeding, assuming just for the sake of argument that the standing has been asserted, at least to the extent of preemption, what is the injury that is shown here? You're obviously saying there is no injury, but you have to help us respond to the that their share has been going up all this time. Well, first of all, I'd assume. Excuse me. I'm sorry. The Sparkman Declaration. I have it reversed, but go ahead. The Sparkman Declaration, starting in 460, does not support that assertion. The Sparkman Declaration says starting in 2003, and that's the point I was going to make, they talk about 2001 statistics. Their own biologist says this, quote, race fishery started in 2003. So they're having a hard time deciding when their supposed injury started. But even if getting past that point, there is no reduction. In fact, some of these resources are not even fully harvested. Okay. So you talked about your mosquito example, if there's plenty of mosquitoes. And Skokomish came up here and said, oh, there's not plenty of mosquitoes. Well, all of the share of salmon is not harvested in Hood Canal every year. All of the share of clams is not harvested in Hood Canal every year. So don't come up here and say you can't trap as much mosquitoes. In addition, competing for resources is not a new concept. Fishermen all over the United States compete for resources. You and I compete for resources if we go out and go fishing. But Skokomish asserts because of the treaty, they have the right to get up at 10 instead of 8. And that's the real problem here is the race fishery. And the nine tribes agreed with us at the hearing. The race fishery is not an injury unto itself. A competitive fishery is sometimes required because salmon are only in the water for a certain amount of time. You've got two weeks. Well, you can say you want to go on the last day, but you better get out there the first day and start fishing. And you don't have a right under the treaty to fishing without competition to the said Indians because the right secured to said Indians under the treaty was a collective right. And that collective right under the treaty of point-no-point means that we get to go out there and we all have the opportunity to fish for the resource. And some of us may do better. And some of us may have more boats than the other. And some of us may decide to get up at 5 o'clock in the morning and put a few extra nets out. And it's not an injury unto itself that we compete for resources. It's not. And that's the kind of move around. But I try to trap what they say the injury is. And the injury is the, quote, race fishery. Is this a matter of law or a matter of fact, the injury issue? In other words, Ken, is the record complete? Could this panel determine that without further fact-finding? Yes. And the record is complete on that issue because you look at their facts alleged and their request for determination, and it's a so what. We have to compete with other people for resources. Well, you know what? If I want to get paid, I've got to get up at 6 o'clock. And if I don't get up until 8, I don't get paid from 6 to 8. And that's how it works in the treaty of fishing. And that's how it works in fishing in general in the United States of America. And, in fact, U.S. v. Canada, common in treaties, Canada authorizes race fisheries or requires it because of the limited amount of time that resources are available. But if we go back to the Nine Tribes Appeal, the Nine Tribes make a mountain out of a molehill, and they say that this case will preclude all intertribal issues. And I urge you to go back to the order on reconsideration where the courts say, no, what is barred is a simple request for an allocation in absence of factors whereby one tribe is being preempted. And we don't have these factors here. If we look at the cases that they all cite as the law of the case that authorizes this case to be looked at, we see geographic preemption where Makah, who is really worried about this case not having a forum, taking the halibut before they swim in and come down to Hood Canal. Hood Canal is down here. We are right here in Hood Canal. Lower Elwha is over here. So we've got Lower Elwha and Skokomish saying, we're worried about physical preemption, but we admit we're taking up to 90 percent of the salmon. Nobody is corking them off. In addition, ESA has closed the fishing area outside of Hood Canal, and the tribes can't even go fishing during the time period of the operative injury between 2003 and 2005. It was closed. We couldn't have fished for Chum or Chinook. It shows that, you know, you can make a claim, okay? And I know that you can't make a factual determination. You have to assume that in the light and most favorable, but if you look in the light and most favorable at their complaint, they are throwing spaghetti at the wall, and they're saying, my treaty right, my treaty right, and I say, what is injured with your treaty right? What, pray tell, have we done? We go fishing just like each and every one of these tribes in this room. We issue regulations the same way, and the problem with the revolving courthouse door is because they have a problem with us. They can drag us in here, make us spend thousands of dollars on legal fees to defend ourselves for doing what every single other tribe here does, issue regulations, and we go fishing, because that's what it means to exercise the treaty right, and we have not interfered in any way with their ability to issue regulations and go fishing. If they want to get up at 10 instead of 8, they may not catch as much as we do, but I'll assert, even in the light and most favorable, all their big injury is is that two tribes in one species, and again, there's seven species in Hood Canal, caught 52,000 while one tribe caught 28. Well, if we'd caught, if both of our tribes had done as well as Skokomish, we would have caught more than that. Okay? So I don't, there is no injury asserted. There is no injury, and anything before 2003, and in Laura Elwes' brief, it's 2004, cannot be considered as evidence because we were operating under an intertribal compact. So you can't agree to the compact and then say, hey, that didn't work out as well as I thought. I mean, in reality, that's what they've done with the Hood Canal Agreement. They've agreed to a process by which compacts should be executed, and then they say, hey, you know what, that doesn't work out as well as I thought. I'd rather go to the court and let you guys tell me how much they can take, and in addition, I want you to use our primary right, even though I've agreed not to exercise it under any condition or any reason whatsoever, use that primary right as a factor for the allocation. Well, we know what that means. If you use the primary right, and this is seen in the request for determination at ER 29 and ER 30, as a factor in the primary right, and you use all the factors you used to get the primary right, well, we can see where it's going. Skokomish wants the majority of the resources, and they like what they've been taking, and that's why they want the court to use harvest statistics as a measure. They like what they've been taking, and they prefer not to compete for it. And so what they've said is set this in stone. And my clients say, you know what, we prefer the compact method, where we can agree if the price for salmon is high and the crab price is low, that this year we'll agree to this much, and next year we'll agree to that much. And we don't want our treaty right permanently set in stone for all time, and to tell our fishermen, look, you guys, what we've agreed to is that you have the treaty right to go back and harvest the remainder of the Hood Canal resources after Skokomish is done meeting its needs. And that's not fair. That's not fair, and that's not what we agreed to in the Hood Canal agreement. We didn't agree for them to use the primary right again against us, and we didn't agree to have our treaty right fixed in perpetuity to a particular number of fish and have Skokomish have the majority allotted to them, which is what they want. That's why they want the harvest statistics to be used. If they were doing so poorly, why would they want to use the historical harvest as the measure of the fair share? I ask you that, because it's not fair. In your remaining time, could you lay out just a summary outline of how you think this Court should dispose of the case, just kind of headings for the paragraphs, because it sounds to me as though it would be somewhat different from the way the district court disposed of the case, and I want to make sure I've got it exactly right. And specifically include the jurisdictional issue. The district court threw it out on jurisdiction. The district court threw it out on jurisdiction and the raised judicata effect of the Hood Canal. And your entire argument was, I suppose, assuming that there was jurisdiction going to the merits. Assuming that there was jurisdiction, allocation requires consent. And this Court, and interesting, Skomish never mentioned this, already ruled in Subproceeding 05-1 that unilateral limitations on skylum harvest violate the express terms of the Hood Canal Agreement, and already looked at the two provisions in 7b that I'm talking about. All right. So please respond to Judge Kleinfeld's question. So I'm not sure I understand. So you want me to lay out. Find a rough draft of what you think the decision by this Court ought to be. Well, I think you should affirm. Affirm is the first word. Affirm. I think you should affirm the decision of the district court. I want to make sure I get your reason. Okay. Okay. And so I want you to just lay out an outline of what you want to say. The Court, this Court should affirm the decision of the district court because the raised judicata requires a consent in the Hood Canal Agreement for allocation. There is no such consent. Even though you filed a request for determination? Isn't that implicitly consent?  No. There's no consent in the request for determination. They filed a request. Why didn't you revoke the jurisdiction of the court? Why isn't that consent? We didn't file a request for determination in the subproceeding. I thought you did. No, no. We're the appellees. We did not file it. Skokomish filed a request for determination. Apologize. Sorry. Sorry. Sorry. I still think you did. I did. Originally, the case was with subproceeding 05-1. Well, yeah. And it was bifurcated. And we filed it, yes. And it was bifurcated on our motion, because we asked the court for judicial efficiency to separate the two claims, because we knew that the raised judicata decision of 05-1 would preclude an implicit decision in 05-2. Why isn't that implicit invocation of the court's jurisdiction? Because we were we filed our determination came before theirs. We had no idea what they were going to claim. We were claiming the enforcement of the Hood Canal Agreement, of which the court had jurisdiction. Okay. Okay. So to go back to the question. Is this all about, then, this subparagraph B, may exercise their respective treaty rights without any limitation or control whatsoever by any of the stipulated parties, except as the stipulated parties may mutually agree by compact or otherwise? That provision is the provision that sets the future forward looking of the Hood Canal Agreement and the mutual consent provision. If you've got a treaty fishing right, there's no limitation unless you subsequently agree to one. Yes. And if you when you ask back about how to write this decision, we would additionally say with respect to the Skokomish's extraordinary request, and let's remember this is an extraordinary request for equitable allocation. Idaho Ex Ray Evans dismissed Idaho's claim. Counsel, just get to the point. Okay. So the court should affirm the decision on subject matter jurisdiction because, first, the Skokomish tribe made a simple request for an allocation in absence of factors by which any tribe could or did preempt the other tribe's opportunity to fish. And opportunity is important because you do not own the fish. But if we're not persuaded by that argument, what's your fallback? That the Hood Canal Agreement bars allocation without consent. In addition, there's no standing. They have failed to raise any injury under the treaty, even in the light most favorable. And in addition, there's no treaty language. And this is sort of the elephant on the table that we've upset everybody with. And that's why everybody is here. There's no treaty language in the Treaty of Point-No-Point that entitles any tribe, any present-day tribal entity, to a specific share of fish. There is no such right. All the cases cited by my opponents have been cases where the State and tribes were competing. And if you go back to passenger fishing vessel, what they were concerned with is when the State and tribes were competing for resources, the State was taking all of it. And so they had to allocate. Thank you, Counsel. We've allowed you to go way over time to respond to Judge Kleinfeld's question. And we'll give some additional time to your side, Counsel. Thank you, Your Honor. If you could also outline what you think we should be saying, that would be helpful. Yes, Your Honor. Write the decision for us, please. We would urge the Court to reverse and remand and send this back for determination on the merits. The problem is if you like a race fishery, as Sklallam does, it's okay. But the district court's ruling allows Sklallam to oppose a race fishery whenever they want. And we never had a chance to get our day in court, if you will, to set forth Skokomish's side. Now, addressing standing, the allegations of the RFD are to be taken as true for purposes of determining standing, and contrary to what Counsel said, Skokomish was not taking a majority of the resource. Our reply brief, again, at pages 2 to 3, describes the available evidence in that regard. This case is quite similar to 96-1, where three tribes sought protection from Quelyut's expanded use of pot gear. The district court entered a preliminary injunction setting aside an allocation and limiting Quelyut's use of pot gear to protect the right to a fair share and the right to manage the fishery. This case, too, should be heard on the merits. It does require a factual determination, and the Hood Canal Agreement does not affect it. And let me say why. It seems to say, well, it does say, without any limitation or control whatsoever by any of the stipulating parties. Why isn't that an agreement that became an order of the court, because it was a stipulation in a case, that there won't be limitations or control by any tribes against any other? There are three reasons, Your Honor. First, by agreeing to that language, Skokomish did not agree that Sklallam could impose a race fishery on Skokomish's rights, nor did it... Race fishery isn't a limitation or control. It's the absence of limitation. Well, the RFD alleges that it's the race fishery that is denying Skokomish its right to a fair share and its right to manage. And Skokomish doesn't consent to limitations on its own rights by agreeing that the parties can exercise their rights without limitations or control. Remind me again, where do you get a right to a fair share? It comes directly from passenger fishing vessel, Your Honor. In U.S. v. Washington, this Court affirmed Bolt I, recognizing each tribe has its own treaty right. It was a reserved right. And in fishing vessel, the Court interpreted the right, saying it's a right to a fair share of fish, and recognizing specifically that each tribe may, an individual tribe, rather, may enforce that right, as in Poyallup and Winans. And more fundamentally, Your Honor, the reason that a Federal determination of fair share is necessary is otherwise there will be no protection for the right. Otherwise, the tribe will have given up what it gave up in the treaty, but will have no means of securing the fair share, which fishing vessel said is an amount sufficient to meet the Indian's reasonable livelihood needs. Now, that can be a difficult determination to make, but I urge that the district court has shown great skill in making it. Second, a limitation or control does not mean an allocation. An allocation is a judicial determination of each tribe's fair share at the Hood Canal Fishery. In U.S. v. Washington, this Court stated very plainly, 520 Fed 2nd at 688, 686, an apportionment deprives the Indians of no rights. And finally, I would say the Hood Canal Agreement, Your Honor, cannot be construed more broadly than the claims that it resolved. And those claims were the primary rights claim and the usual and accustomed fishing places claims of Lower Elwyn Court Gamble. The district court expressly held, this is at ER 354, that Skokomish's claim did not present a question of allocation. Before submitting the case, I would like to ask these counsel the same question I asked before, based on the Supreme Court's strong suggestion that equitable jurisdiction must be limited in duration and extent. And since this case has been going on since at least 1974, well over 30 years, I'd be interested in counsel's views in terms of when can we expect that this U.S. v. Washington case can be concluded. Counsel, do you want to try that? And then we'll hear from this side. You've asked a question that every judge that gets assigned to this case asks, when will this be over? And every time, everybody panics and says, we need you, we need you, we need you, because we have sovereign immunity. And let's face it, it's not working. The judges in this court and the judges in the district court are not making the lives of the Indian people better. They're making the lives, perhaps, of the attorneys representing the Indian people better. But, I mean, I'm not saying that my counsel is monetary determined, but the fact remains is as if you have a big family, albeit maybe a dysfunctional family, and if you always had a judge that could go to and say, Joey's wrong and Susie's right, and you always had this opportunity, you never get the opportunity to help yourself. And the fact remains, just as U.S. and Canada, even though they don't have a forum to put the hammer on each other, nations work it out through political and internal mechanisms. And if they're forced to do so, and I've seen many circumstances where the parties have done so, they will. And if this court did not always have its finger in the pot and be that big decider that could tell Joey or Susie how to play in the sandbox, I believe that the tribes have the honor and integrity to not hurt each other and could work this out. And we've seen circumstances like this. And the problem is, is everybody's afraid to try. Everybody panics. What would happen in a meeting if I couldn't run in and say, I'm going to sue you? Because that's what happened here. I'm going to sue you if you don't do what you want. I'm going to sue you. And at treaty times, you didn't have the I'm going to sue you. You had to work it out. And maybe you traded some fish and maybe you traded some casino gaming chips or whatever it is, but you worked it out. And I believe the nations here can work it out. And the Court has not shown in the past 30 years between the intertribal disputes of doing anything other than encouraging it, because what happens is, is that there's no there's no deterrent. There's no attorney's fees in this case. There's no deterrent to tribes to bringing it to the Court's attention. They have nothing to lose. They have nothing to lose but to bring it to you. Thank you, counsel. Spokesman for this side. Anyway, up to you, anyone. Well, if you're going to speak, I would like you to come to the podium because it's being recorded. Your Honor, let me say my observation is that this case is being managed very efficiently given the size of the case area, the number of UNAs, the number of tribes involved and the nature of the activity, anadromous fish and other species. What kind of money are we talking about? I don't know, Your Honor. You mean six figures, seven figures, eight figures? With regard to the fish issue. What we're talking about here is money. Which tribe can get how much money out of the fishery? I don't know the value of the fishery, Your Honor. But I would say what we're really talking about is treaty rights. And the question that this case presents is what meaning does a right have if it can't be heard and enforced in Federal court when it was given in a treaty by the United States? And I think the difficulty of hearing these cases has been surmounted by the district court's patient and diligent management. Does all the casino money basically have to go to lawyers' fees to litigate the treaty rights? Or is there enough fishing revenue so that it's worth it? Well, I don't know what is done with the casino revenue that's controlled by Indian Gaming. The money has to come from somewhere. I mean, lawyers can't work for free. The Indian Gaming Regulatory Act, Your Honor. But I would say that it's not simply this case is not simply about treaty rights here. This case was the basis for the recognition of rights in the Great Lakes in the Milox case. This case was the basis for recognition of Indian treaty rights and a rejuvenation of Indian culture. But those cases didn't go on for years and years and years like this one did. No, but, Your Honor, there have only been a handful of intertribal allocation disputes. All right. And those have been effectively heard. Thank you, counsel. Mr. Burley, did you want to add a word? Sure. Your Honor, there was a thought to Sunset, this case, in 1993. With 20-plus tribal sovereigns, the State of Washington, Federal agencies, the thought was to keep it alive on a subproceeding basis. It does serve a kind of an institutional function. Unfortunately, you see things only when they break down. There has been tremendous success among the tribes to resolve disputes. Well, subsequent to 1993, I gather, we've had some determinations out of the Supreme Court of the United States, the Oklahoma City schools case, the Kansas City tax case, where the court's getting very doctrinal in reminding the lower courts that equitable proceedings have to come to an end. They can't be open-ended. Well, in terms of fisheries management and allocation, when the courts decided the tribes have a treaty right and decided that collectively the tribes can take 50 percent, you do force some intertribal treaty rights disputes from time to time. That's a matter of Federal law. And as a practical matter, fisheries have to be managed more or less on an annual basis. There are stock assessments on an annual basis. Fishery power has to be assessed on an annual basis. There's a lot of things. There are a lot of annual processes. And fortunately or unfortunately, this court serves a sort of institutional function as a way those can be resolved. If this case were dismissed, there would either be self-help or the United States would have to sue somebody and drag them into court. The judicial inefficiencies would be worse. Why would the United States have to take the lead in something like that? Well, the nature of tribal sovereign immunity, Your Honor, the United States may be capable of bringing a tribe to court. But ordinarily, you cannot drag 20-plus tribal sovereigns to court, except that they've already been here, they've come here to have the equitable power of the court be invoked to protect their treaty rights. Thank you, counsel. There may be no other form. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Rymer, Kleinfeld